IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SALEM WOMEN'S CLINIC, INC.,                    Civil No. 07-6092-HO
an Oregon corporation, and
ELIZABETH R. HARMON, M.D.,                     ORDER

                    Plaintiffs,
          v.

SALEM HOSPITAL, an Oregon
hospital non-profit
corporation,

                    Defendant.


<u>Background</u>

     The complaint alleges violations of the Sherman Act and

state antitrust statutes, and state common law claims for breach

of the covenant of good faith and fair dealing, and interference

with economic advantage.  The claims stem from defendants'

suspension of plaintiff Dr. Elizabeth Harmon's obstetric (OB)

practice privileges at defendant Salem Hospital, and Salem

Hospital's policy limiting a physician or call sharing group to

no more than four collaborative certified nurse midwives (CNMs).

By order dated June 28, 2007, the court denied plaintiff's first motions for temporary restraining order (TRO) and preliminary injunction (PI).  The court found plaintiff's fact-dependent anti-trust claims difficult to assess on the preliminary record. The court further found little evidence of irreparable harm or risk to public health and safety, and noted that plaintiff's alleged injuries are compensable.  The court also noted there was little evidence regarding the delineation of a relevant market, effects on a market, nexus to interstate commerce, and anti-trust injury.

Plaintiffs filed second motions for temporary restraining order (TRO) and preliminary injunction (PI), and a motion for leave to file first amended and supplemental complaint. Plaintiffs' contend that several events occurred after the June 12, 2007 hearing on plaintiff's initial motions for preliminary equitable relief, necessitating the latest filings.  The parties fully briefed the motions and presented oral argument to the court.  According to plaintiffs:

In a letter dated September 25, 2007, Judy Marvin, M.D., Salem Hospital's new Obstetrics Director, repudiated the June 12, 2007 promise of her predecessor, Jolen Verhozen, M.D., that Salem Hospital OB "Hospitalist" staff physicians will provide backup and collaborative obstetrical coverage to SWC CNMs through the completion of Dr. Harmon's hearing under the Salem Hospital fair

2 - ORDER

hearing plan.  Dr. Marvin wrote that Salem Hospital would cease to back-up SWC CNMs effective January 1, 2008, because SWC admitted new OB patients and arranged for no backup coverage other than the OB hospitalists.  Pl's ex. 14.

After receiving Dr. Marvin's letter, Dr. Harmon provided SWC's four practicing CNMs, Margaret Egeland, Patricia Barnes, Kathryn Nielsen and Elenie Smith, with written notice that SWC would terminate their employment after January 4, 2008.  SWC did so.

On January 7, 2008, SWC received a written statement from Salem Hospital announcing that effective immediately, Salem Hospital would employ the four CNMs, the CNMs "decided to continue their collaboration with the OB hospitalists[,]" and the CNMs "will provide comprehensive obstetrical care to low-risk pregnant women as Willamette Valley Midwives, a part of Salem Health."  Pls' ex. 18.

Also on January 7, 2008, the CNMs filed an action against SWC in state court to avoid the terms of a restrictive covenant in their employment contracts.  The covenant includes a "buy-out" provision.  On April 16, 2008, the state court allowed Salem Hospital's motion to intervene and denied SWC's motion to stay the case until this court resolves plaintiffs' motions for preliminary relief to enjoin Salem Hospital from intervening in the state court action and plaintiffs' motion for leave to file

first amended and supplemental complaint, which names the CNMs as
defendants.  Pls' exs. 20B, 20C, 27.

The CNMs have not made payments to SWC under the buy-out
provisions of their employment contracts.  The CNMs continue to
practice midwifery as Willamette Valley Midwives.

In February 2008, at the request of plaintiffs' attorneys,
Frank G. Fox, Jr. issued a report entitled, "Salem Hospital
Service Area Analysis: All Inpatient Discharges, including
Neonates."  The report includes Fox's opinion that Salem Hospital
has a dominant market position with little competition in a
highly concentrated service area.

Additional factional details and issues are discussed in the
course of evaluating the parties' arguments.

Discussion

I.  Plaintiffs' Motion for Leave

Plaintiffs seek leave to file a "first amended and
supplemental complaint" to add as defendants SWC's four former
CNMs, and Salem Clinic, PC, and to assert factual allegations
based on events that occurred after the complaint was filed.
Leave to amend is freely given when justice so requires.  Fed. R.
Civ. P. 15(a)(2).  "[T]he court may, on just terms, permit a
party to serve a supplemental pleading setting out any
transaction, occurrence, or event that happened after the date of
the pleading to be supplemented."  Fed. R. Civ. P. 15(d).

Plaintiffs assert that since filing the complaint, they have learned that Salem Clinic facilitated and participated in the biased peer review and credentialing undertaken to restrain competition in the birthing services market, that Salem Clinic took action in concert with the hospital and others to deny SWC alternative backup physicians, and that Salem Clinic took other actions to structure the market for birthing services. Dr. Harmon states that Salem Clinic and other providers participated in meetings with the hospital, from which she was excluded. She states that the purpose of these meetings was to discuss what would become of SWC midwifery patients. Dr. Harmon further states that she learned from SWC CNMs that the meetings included CNMs and preceded Dr. Marvin's September 25, 2007 letter providing that Salem Hospital would cease to provide backup and collaborative OB physician coverage for SWC CNMs. Dr. Harmon states that based on patient transfer information, Salem Clinic appears to be the primary beneficiary of SWC's absence from the birthing services business. 2nd Harmon Decl. at 4.

The proposed pleading contains Sherman Act claims against Salem Clinic and the CNMs. It further alleges a claim that Salem Hospital interfered with the employment contracts between SWC and the CNMs, and a claim that the CNMs breached the employment agreements a dozen ways, including by providing midwifery services at Salem Hospital without "buying out" the restrictive

5 - ORDER

covenants of the employment contracts.  The proposed pleading
also contains allegations defining the primary and secondary
service areas of Salem Hospital.

Citing to Planned Parenthood v. Neely, 130 F.3d 400, 402,
(9th Cir. 1997), Salem Hospital argues that plaintiffs may not
introduce a separate, distinct and new cause of action by way of
supplemental pleading.  The hospital would characterize the
breach of employment claims against the CNMs as a separate,
distinct and new cause of action.  The court disagrees.

Plaintiffs seek to supplement their Sherman Act claims with
allegations that the hospital and CNMs monopolized and attempted
to monopolize the market for midwifery services in the Salem
Hospital service area.  The breach of contract claims stem from
the same nucleus of facts as the proposed supplement to the
Sherman Act claims.  Supplementation would promote judicial
efficiency, the goal of Rule 15(d), because multiple claims
related to the same nucleus of facts could be litigated in one
forum.  Id.  Moreover, the state court action may not determine
whether the CNMs breached the employment contracts.  Salem
Hospital argues that the state court action must be allowed to
proceed.  Supplementation of the complaint will not impede the
state court action.

Citing to AmerisourceBergen Corp. v. Dialysist West, Inc.,
465 F.3d 946, 952-53 n.9 (9th Cir. 2006), Salem Hospital argues

that leave to amend the complaint would impermissibly introduce a
new theory of the case - that Salem Hospital endorses midwifery
and attempted to monopolize the market - in contrast to the
original complaint, which alleged that Salem Hospital was hostile
to midwifery and wrongly sought to restrict Dr. Harmon's
midwifery practice.  The new, purportedly contradictory
allegations support plaintiffs' broader claim that the hospital
intends to monopolize the birthing services market.
AmerisourceBergen is distinguishable.  In that case, the proposed
amendments contradicted the company's previous admissions "mid-
stream," without any proffered reason.  465 F.3d at 953, n.9.

    Salem Hospital finally argues that if plaintiffs' are
granted leave to file an amended complaint, the scope of the
operative pleadings will be unclear, because amended pleadings
supersede original pleadings, whereas supplemental pleadings do
not.  An order specifying that a new pleading supersedes the
complaint should adequately protect the hospital from confusion.

    The current discovery deadline is October 1, 2008.  There
are no pending dispositive motions.

    Plaintiffs' motion for leave to file first amended and
supplemental complaint is based on information gleaned and/or
events that occurred after filing of the original complaint.  The
events and information stem from or are otherwise related to the
events that gave rise to this action.  Judicial efficiency and

7 - ORDER

justice are served by amendment and supplementation.  Plaintiffs'

motion for leave to amend and supplement the complaint is

therefore granted to the extent that plaintiffs shall file a

first amended complaint which includes supplemental allegations

against Salem Hospital, as well as new allegations and claims

against Salem Clinic and the four CNMs.  Plaintiffs' are

retroactively granted leave to file the "FIRST SUPPLEMENTAL

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES" filed March 3, 2008.

This pleading supersedes the complaint.

II.  <u>Plaintiffs' Motions for Preliminary Relief</u>

Plaintiffs seek the following relief:

(1) require Salem Hospital to maintain accurate records
of income and expenses attributable to Willamette
Valley Midwives;

(2) require Salem Hospital to provide these records
monthly to plaintiffs;

(3) require Salem Hospital to segregate gross income
from the operation of Willamette Valley Midwives;

(4) require Salem Hospital to pay 60% or other
equitable percentage of the gross income of Willamette
Valley Midwives monthly to plaintiffs;

(5) appoint a trustee at the expense of Salem Hospital
to supervise the record-keeping of Willamette Valley
Midwives;

(6) in the alternative to requests (1)-(5), enjoin
Salem Hospital from employing the CNMs to provide
midwifery services during the pendency of this
proceeding;

(7) in the alternative to requests (2)-(6), enjoin
Salem Hospital from employing the CNMs to provide
midwifery services absent compliance of the CNMs with

8 - ORDER

paragraph 8 of their employment contracts with SWC;

(8) enjoin Salem Hospital from intervening in the Marion County Circuit Court case filed by the CNMs;

(9) enjoin the CNMs, if they become parties, from maintaining the foregoing state court action; and

(10) grant such other relief as the court deems appropriate.

Plaintiffs characterize these requests for equitable relief as falling into two categories: requests that preserve the economic status quo; and (2) requests that aid this court's jurisdiction.

> [A] court may grant a preliminary injunction if a plaintiff shows (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant a preliminary injunction if a plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable harm or that serious questions are raised and the balance of hardships tips sharply in his favor.

Earth Island Institute v. United States Forest Svc., 442 F.3d 1147, 1158 (9th Cir. 2006) (internal citations and quotations omitted).

A.  Irreparable Harm

Plaintiffs argue that the unconditional continuation of Willamette Valley Midwives renders it increasingly unlikely that plaintiffs or other provides can compete effectively in the market for midwifery care.  No evidence supports this argument,

9 - ORDER

however.

Plaintiffs argue that the hospital essentially usurped the midwifery practice they built over 11 years, and that they will be unable to compete against their former employees. The court notes that the hospital did not take SWC's business name, and SWC had employed one CNM for approximately one year, while the other three CNMs had tenures with CNM of approximately two years.

Plaintiffs' requests for record-keeping procedures and payments from Salem Hospital suggest that plaintiffs' harm is compensable, and therefore not irreparable. There is no evidence that the hospital keeps shoddy records. Furthermore, to the extent an injunction would be based on the anti-trust statutes, plaintiffs will have no anti-trust injury until they prove that Salem Hospital acted with an illegal anti-competitive purpose.

Plaintiffs filed this second round of motions for preliminary relief only after the CNMs filed their lawsuit in state court. Plaintiffs were notified in September 27, 2007 that the hospitalists would cease providing backup for the CNMs. Plaintiffs' delay suggests that they do not face an immediate threat of irreparable harm.

B. Propriety of Relief/Public Interest

Plaintiffs argue that the court should bar Willamette Valley Midwives from accepting new patients, because permitting it do so during the pendency of the litigation will expand the pool of

innocent consumers who will be hurt if Willamette Valley Midwives is required to stop caring for them by an order of this court. As discussed below, plaintiffs do not make a strong showing that they are likely to prevail on their anti-trust claims.  Assuming for argument that this case will result in the closure of Willamette Valley Midwives, there is no evidence that winding down that business cannot be accomplished in a manner that protects customers.

Plaintiffs previously argued that SWC CNMs should be permitted to perform deliveries at Salem Hospital during the pendency of the hearing on renewal of Dr. Harmon's OB privileges owing to a shortage of providers of delivery services.  That argument suggests that the public interest would not be served by an order prohibiting Willamette Valley Midwives from accepting new patients.

Plaintiffs ask the court to enjoin the CNMs from prosecuting the state court case, and to enjoin Salem Hospital from intervening.  As noted, the state court has allowed Salem Hospital to intervene.  The Anti-Injunction Act prohibits this court from enjoining the state proceeding, because such an injunction is not necessary to aid this court's jurisdiction in this case.  28 U.S.C. § 2283.  The test is whether injunctive relief is necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as

11 - ORDER

to seriously impair a federal court's flexibility and authority
to decide that case.  Atlantic Coast Line R. Co. v. Brotherhood
of Locomotive Engineers, 398 U.S. 281, 295 (1970).  Although
plaintiffs' proposed pleading and the state court case involve
claims on the CNMs employment contracts with SWC, the claims are
distinct.  Even if the claims were identical, the Anti-Injunction
Act would not permit the court to interfere with the state
court's concurrent jurisdiction.  Id. At 295-96.

    C.  Likelihood of Success

Most of plaintiffs' memorandum in support of their second
motion for preliminary injunction addresses the likelihood
plaintiffs will succeed on their monopolization claim under
Section 2 of the Sherman Act.  "Every person who shall monopolize
. . . any part of the trace or commerce among the several States
. . . shall be deemed guilty of a felony, . . ."  15 U.S.C. § 2.
Plaintiffs state that they focus on Section 2, because a
defendant that has monopoly power under Section 2 necessarily has
market power relevant under Section 1.  The court notes that a
Section 1 claim also requires a contract or conspiracy to
restrain trade between the states.  15 U.S.C. § 1.  The court
previously noted the dearth of evidence of such a contract or
conspiracy.

    1.  Traditional Monopoly Claim

To prevail on a monopoly claim, plaintiffs must prove that

12 - ORDER

Salem Hospital "possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power." <u>Image Tech. Svcs., Inc. V. Eastman Kodak., Co.</u>, 125 F.3d 1195, 1202 (9th Cir. 1997). Monopoly power, commonly known as market power, is the power to control prices or exclude competition. <u>Id</u>.

> Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power. The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.

<u>Rebel Oil Co., Inc. v. Atlantic Richfield Co.</u>, 51 F.3d 1421, 1434 (9th Cir. 1995).

a. Relevant Market and Market Share

Plaintiffs define the relevant market as the market for neonate services, based on inpatient discharge data, in Salem Hospital's "primary service area" as defined by healthcare economist Frank Fox, Ph.D. Plaintiffs explain Dr. Fox's methodology and the authority for its use. Dr. Fox opines that Salem Hospital has a 74.9% share of the market for neonate services in its primary service area. A market share of 65% is generally required to state a prima facie case of market power.

13 - ORDER

Image Tech, 125 F.3d at 1206.  Salem Hospital does not challenge plaintiffs' evidence delineating the market and establishing the hospital's role in the market.  Even assuming that plaintiffs' evidence adequately defines the relevant market and that Salem Hospital possesses market power plaintiffs have failed to address other deficiencies this Court previously identified.

The court has reservations regarding plaintiffs' characterization of the relevant market.  Dr. Harmon and SWC are not competitors of Salem Hospital in the market for neonate hospital services.  Rather, with respect to Dr. Harmon's hospital OB privileges, Dr. Harmon and SWC were competitors of the hospitalist and non-hospitalist OBs in the market for hospital OB care.

### b.  Barriers to Market Entry and Expansion

Plaintiffs contend that cases involving alleged monopolistic behavior by hospitals universally agree there are significant barriers to entry to the market for hospital services.  As noted, SWC and Dr. Harmon were not in the business of providing hospital services.  Furthermore, the cited cases involve mergers.  See Pl's Memo. at 10.

Plaintiffs also contend that they cannot easily build up a new midwifery practice now that the hospital has usurped the practice Dr. Harmon built over 11 years.  However, plaintiffs elsewhere argue that consumers will not distinguish between SWC

14 - ORDER

and Willamette Valley Midwives, and CNMs Smith, Nielsen, Barnes,
and Egeland commenced employment with SWC on June 4, 2006,
January 31, 2007, May 15, 2006, and February 2, 2006,
respectively.  While it is not easy to build up a business, SWC
has survived the turnover of CNMs in the past.  Without evidence
that there is no more room in the relevant market for CNM
services, SWC does not convincingly demonstrate that the loss of
the four CNMs constitutes a significant barrier to entry into the
market.

2.  Alternative Essential Facilities Doctrine

Section 2 of the Sherman Act may also be violated when the
owner of a facility denies access to a competitor for an anti-
competitive purpose.

> The "essential facilities" doctrine imposes on the
> owner of a facility that cannot reasonably be
> duplicated and which is essential to competition in a
> given market a duty to make that facility available to
> its competitors on a nondiscriminatory basis.  In order
> to prevail on such a claim, the plaintiffs must
> establish (1) that the defendant is a monopolist in
> control of the essential facility, (2) that competitors
> of the monopolist are unable to duplicate the facility,
> (3) that the monopolist has refused to provide the
> competitors access to the facility, and (4) that it is
> feasible for the monopolist to do so.

Ferguson v. Greater Pocotello Chamber of Commerce, Inc., 848 F.2d
976, 983 (9th Cir. 1988).  The refusal of access must be for an
anti-competitive purpose and the injury must be severe.  City of
Chanute, Kansas v. Williams Nat. Gas Co., 955 F.2d 641, 648 (10th
Cir. 1992), overruled on other grounds by Systemcare, Inc. v.

15 - ORDER

Wang Laboratories Corp., 117 F.3d 147 (10th Cir. 1997).

As the court noted when it denied plaintiffs' first set of motions for preliminary relief, the presence or absence of an anti-competitive purpose is a highly disputed issue of fact that is difficult to assess at this stage of the case. Plaintiffs argue that Salem Hospital lacked a legitimate reason to renege on its promise to backup the CNMs, while the hospital points to SWC's failure to arrange alternative backup physician coverage, Dr. Harmon's failure to maintain OB malpractice insurance after June 2007 and Dr. Harmon's decision to cease advising SWC CNMs regarding patients who would deliver at Salem Hospital. The parties dispute whether this presented any patient safety problems. The parties also dispute the scope, nature and/or extent of backup physician services the hospital agreed to provide for SWC CNMs. The presence or absence of anti-competitive purpose remains a highly disputed issue of fact not easily assessed at the preliminary stage of the case.

3. Section 1 Claim - Conspiracy in Restraint of Trade

Plaintiffs briefly touch on their Section 1 claim when they argue that the fact that the CNMs went to work for Salem Hospital on January 7, 2008 demonstrates concerted action between the CNMs and Salem Hospital. This fact does not demonstrate a per se conspiracy to restrain trade, however.

Plaintiffs also highlight the fact that the CNMs have not

16 - ORDER

"bought out" the restrictive covenants of their employment contracts.  All admit that Dr. Harmon suggested that the CNMs might find employment at Salem Hospital.  Dr. Harmon contemplated that the hospital might fund the buyouts and that her claims against the hospital would be preserved.  As noted, the CNMs seek a state court judgment declaring that SWC breached their employment agreements and that they are not liable for the buyout.  The CNMs state that the hospital initially declined their requests for employment before reconsidering.

The only anti-competitive feature of the alleged agreement between the CNMs and Salem Hospital is a requirement that the CNMs turn away patients while still employed by SWC, which Dr. Harmon believes occurred.  The motivation for such an agreement is not apparent.  The CNMs dispute that they turned away potential patients while employed at SWC.

Plaintiffs do not prove they are likely to prevail on a

///


///


///


///


17 - ORDER

claim that the hospital and CNMs conspired to restrain trade in violation of Section 1 of the Sherman Act.

<u>Conclusion</u>

Based on the foregoing, plaintiffs' motion for leave to file first amended and supplemental complaint [#64] is granted; plaintiffs' 2nd motions for TRO [#60] and PI [#63] are denied. The "FIRST SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES" filed March 3, 2008 supersedes the complaint.

IT IS SO ORDERED.

DATED this ___5th___ day of August, 2008.

_____s/ Michael R. Hogan_____
United States District Judge

18 - ORDER